## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 18-cr-295 (WMW/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jeremy Ryan Myhre, | |
| Defendant. | |

On December 4, 2018, Defendant Jeremy Ryan Myhre ("Myhre") was indicted on one count of Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1) and one count of Possession of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Dkt. No. 1.) This matter is before the Court on Myhre's Motion to Suppress Statements, Admissions and Answers (Dkt. No. 20) and Myhre's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 22). Katharine T. Buzicky, Assistant U.S. Attorney, appeared on behalf of the United States of America and Douglas Olson, Assistant Federal Defender, appeared on behalf of Myhre, who was present at the hearing. The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The Court held a hearing on February 19, 2019, in which the Government presented a witness and offered exhibits. (Dkt. No. 31.) Myhre filed a post-hearing brief on March 15, 2019 (Dkt. No. 36) and the Government filed an opposition brief on March

29, 2019 (Dkt. No. 37). For the reasons stated below, the Court recommends the Motions be denied.

## I. BACKGROUND

At the February 19, 2019 hearing, Special Agent Blackmore ("SA Blackmore") testified about his interrogation of Myhre on December 20, 2016, while executing a search warrant. The search warrant, dated December 19, 2016, permitted law enforcement to search Myhre's residence in Glencoe, Minnesota for child pornography or evidence of child pornography. (Ex. 3 at 4-6.) The application for search warrant was supported by SA Blackmore's affidavit detailing his investigation of child pornography files shared on peer-to-peer ("P2P") networks from an IP address that was registered to Myhre's residence at the time the child pornography was shared on the P2P network. (Ex. 4 at 19-21.)

SA Blackmore's team executed the search warrant on December 20, 2016. (Ex. 3 at 2; Tr. 9.)[1] At that time, three other individuals lived at the residence, including Myhre's spouse, the homeowner, and an individual who was not present during the search. (*Id.*) SA Blackmore testified that, typically, his search team approaches the residence and conduct a "knock and announce" prior to entering the residence. (*Id.*) He testified that when the team approaches, they are wearing body armor with "FBI" or "Police" markings, and have their weapons drawn. (Tr. 10.) SA Blackmore testified that when the door was answered, the search team identified themselves and presented their

---

[1]  The transcript of the hearing ("Tr.") is filed at Docket No. 34.

2

authority with the search warrant. (Tr. 9.) Upon entering the residence, the team conducts a security sweep of the premises, including handcuffing any persons present, to make sure the area is safe before executing the search warrant. (*Id.*)

SA Blackmore testified that the homeowner answered the door and that Myhre and his spouse were in their basement bedroom during the security sweep and were briefly handcuffed. (Tr. 11.) The security sweep took between five and ten minutes. (Tr. 12.) SA Blackmore's role during the search was to conduct interviews. (*Id.*) SA Blackmore testified that he usually removes his clothing with the "FBI" markings and untucks his shirt so it covers his weapon. (Tr. 10.) SA Blackmore interviewed Myhre in a guest bedroom on the first floor. (Tr. 13.) SA Blackmore could not recall if he picked the location, but said he usually asks an interviewee if he or she wants to talk to the police, and if so, where he or she would feel most comfortable talking. (*Id.*) Captain Bienfang from the Glencoe Police Department, who had a visible weapon, was also present at the interview. (Tr. 14.)

SA Blackmore testified that during the interview, he was near the corner of the room leaning back on a stool or small table, with Captain Bienfang to his left, while Myhre was sitting on the edge of the bed. (*Id.*) SA Blackmore asked Myhre where he would be comfortable during the interview and that resulted in their respective positions. (Tr. 15.) During the interview, the door was mostly closed for privacy, but was left ajar. (*Id.*)

SA Blackmore testified that he asked Myhre if he would be willing to participate in the interview and that Myhre agreed. (Tr. 15.) SA Blackmore did not give Myhre a

formal *Miranda* warning. (Tr. 24.) SA Blackmore asked Myhre if he could record the interview, to which Myhre agreed. (Tr. 16; Ex. 1A.) SA Blackmore testified that he tried to make sure that Myhre understood he was not under arrest and asked Myhre if he believed him. (Tr. 16-17.) Myhre stated that he understood and that he believed he was not under arrest and did not have to talk to SA Blackmore. (Ex. 1A.) SA Blackmore described the tone of the conversation as professional and cordial. (Tr. 17.) He testified that at no point did Myhre seem confused, ill, or incoherent, and that he would have stopped the interview if Myhre had seemed so. (Tr. 18.) During the interview, Myhre never asked for a bathroom break or a glass of water, but if he had, it would have been permitted with a police escort. (Tr. 19.) SA Blackmore did not make any promises to Myhre and told Myhre he is not authorized to do so, but told Myhre that if he cooperates, he could inform the prosecutor, but any deals or leniency would be at the discretion of the prosecutor or court. (Tr. 19-20.)

  The first interview was uninterrupted and lasted a little under an hour. (Tr. 17, 22.) Throughout the interview—in SA Blackmore's opinion—Myhre was polite and cooperative. (Tr. 22.) At the end of the interview, SA Blackmore told Myhre that he was free to go about his business. (Tr. 17.) Myhre was not arrested when the interview ended. (*Id.*)

  Sometime after the first interview, SA Blackmore had a brief second interview of Myhre about taking a polygraph. (Tr. 17.) During the second interview, Myhre told SA Blackmore that he would be willing to take a polygraph. (Tr. 25.) The second interview also took place in the house and on the same day. (Tr. 18.) SA Blackmore considered

4

the tone of the second interview to be similar to the first interview. (*Id.*) The second interview lasted less than five minutes.

## II.   DISCUSSION

### A.   Motion to Suppress Statements

Myhre's Motion to Suppress Statements, Admissions and Answers (Dkt. No. 20) initially sought to suppress both a December 2016 statement when law enforcement officers were executing a search warrant and a December 2018 statement after Myhre was arrested. At the hearing, Myhre withdrew his challenge of the post-arrest December 2018 statement. (Tr. 6.) The Court therefore only addresses the December 2016 statement. Myhre makes two challenges to the December 2016 statement: (1) that the interrogation was custodial and therefore he should have been advised of his *Miranda* rights; and (2) that his statement was not voluntary because his will was overborne by a coercive environment.

#### 1.   Custody

Myhre argues that SA Blackmore's interview of him during the search pursuant to the warrant was custodial in nature, and therefore required that he be read his *Miranda* rights. (Dkt. No. 36 at 2-3.) "The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The answer to this question "is not based on the interrogator's perspective; 'the only relevant inquiry is how a reasonable man in the suspect's position

5

would have understood his situation.'" *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017). The Eighth Circuit has developed the following non-exhaustive list of six factors that courts often consider when determining if a defendant was in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three factors are considered "mitigating factors" whereas the last three are considered "coercive factors." *Id.* The Eighth Circuit has warned courts against following the factors "ritualisticly in every *Miranda* case" or "merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827. In this case, the Court finds a review of the *Griffin* factors to be helpful.

The first *Griffin* factor strongly weighs in favor of finding that Myhre was not in custody. SA Blackmore testified that he told Myhre he was not under arrest and that he tried to make sure that Myhre understood he was not under arrest and asked Myhre if he believed him. (Tr. 16-17.) He further told Myhre that Myhre does not have to talk to the police if he does not want to. (Tr. 16.) Myhre stated that he understood he was not under arrest and did not have to talk to the police and that he believed SA Blackmore when he said so. (Ex. 1A.) "That a person is told repeatedly that he is free to terminate an

6

interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Czichray*, 378 F.3d at, 826.  This factor is so powerful "'that no governing precedent of the Supreme Court or [the Eighth Circuit] . . . holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.'" *United States v. Giboney*, 863 F.3d 1022, 1028 (8th Cir. 2017) (quoting *Czichray*, 378 F.3d at 826) (alteration in original).  Here, SA Blackmore's advisements to Myhre that he is not under arrest and did not have to talk to police are strong evidence that Myhre was not in custody.

The second *Griffin* factor—whether the suspect's movement was restrained—also weighs in favor of finding that Myhre was not in custody.  SA Blackmore testified that he invites an interviewee to choose the location they feel most comfortable for the interview and lets them sit wherever they want. (Tr. 13-15.)  He testified that the door remained ajar during the interview. (Tr. 15.)  He further testified that if Myhre had wanted to use the bathroom, he would have been allowed to with an escort for security reasons. (Tr. 19.)  These are all indicia of freedom of movement and indicate that Myhre was not in custody.  Myhre argues that his movement was restrained because if he had asked to use the bathroom, he would have needed a police escort. (Dkt. No. 36 at 3.)  This argument fails for two reasons.  First, following routine police procedures during the execution of a search warrant, such as those designed for officer safety and to avoid evidence tampering, does not make an interview custodial.  *United States v. Sutera*, 933 F.2d 641, 648 (8th Cir. 1991); *Czichray*, 378 F.3d at 828 (noting that Eighth Circuit precedent recognizes that "placing certain ground rules on an interview does not preclude a reasonable person

7

from foregoing the interview altogether"). Second, since Myhre never asked to use the bathroom (Tr. 19), he was not aware that he would need a police escort, and the subjective views of the interrogating officer are not relevant to the inquiry. *See United States v. Brave Heart*, 397 F.3d 1035, 1038 (8th Cir. 2005).

As to the third *Griffin* factor, although Myhre did not initiate contact, he voluntarily acquiesced to the interview, supporting a finding that the interview was not custodial. SA Blackmore testified that he would describe the interview of Myhre as "professional and cordial" (Tr. 17) and that Myhre was cooperative (Tr. 22). Myhre stated during the interview that he understood he did not have to talk to the police. (Ex. 1A.) Myhre also agreed to permit SA Blackmore to record the interview. (Tr. 16.) There was a brief second interview with the same polite and professional tone. (Tr. 17-18.) This conduct supports a finding that Myhre voluntarily acquiesced to the interview. *See, e.g.*, *United States v. Ederhoff*, 14-cr-21(1) DWF/LIB, 2014 WL 1089666, at *6 (D. Minn. Mar. 19, 2014) (citing *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) in which "the Eighth Circuit found that similar conduct on the part of the defendant "supports a finding of voluntary acquiescence")).

Here, none of the "coercive factors" of *Griffin* are present. There is no indication that the officers used "strong arm tactics or deceptive stratagems" to obtain Myhre's statements. Rather, SA Blackmore told Myhre that he is "not authorized to make any promises or any deals" and that any deals or leniency "are at the discretion of the prosecutor and the Court." (Tr. 20; *see* Ex. 1A.) Moreover, the polite and professional environment of the interview suggests an absence of strong-arm tactics. Next, the

interview was not a "police dominated atmosphere." Although there were police present executing a search warrant, there were only two officers interviewing Myhre and Myhre was permitted to ask questions of the officers, which weighs against finding a police dominated atmosphere. *See Axsom*, 289 F.3d at 502 (holding the district court erred in finding the fifth factor where nine officers were involved in the search, but only two interviewed the suspect and "[c]ommunication between the agents and Axsom consisted of two-way questioning" and photographs of the scene reflect a casual scene). Finally, there is no dispute that Myhre was not arrested at the conclusion of the interview (Tr. 17), so the final factor indicates the interview was not custodial.

After review of all the *Griffin* factors and considering the totality of the circumstances, the Court finds that during the interview, Myhre was not restrained, nor was his freedom "restrained to a 'degree associated with formal arrest.'" *Axsom*, 289 F.3d at 502 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). Indeed, as noted above, Myhre was told he was not under arrest, that he did not have to answer any questions, and could terminate the interview. Additionally, Myhre was interviewed at his residence, and the Eighth Circuit has "observed repeatedly" that "[w]hen a person is questioned 'on his own turf' . . . the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) (quoting *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

Accordingly, the Court concludes that the interview was not custodial.

### 2. Voluntary

Myhre next argues that his statement was not voluntary as he was "[u]nder the coercive atmosphere of an interrogation occurring during the execution of a search warrant [and thus] the circumstances were overbearing." (Dkt. No. 36 at 4.)

In the context of a non-custodial statement to law enforcement, the Eighth Circuit has concluded:

> A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination. We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.

*Brave Heart*, 397 F.3d at 1040 (cleaned up); *see also Clark*, 2015 WL 4964665, at *5. The Government must prove by a preponderance of the evidence that the defendant's statements were voluntary. *See Brave Heart*, 397 F.3d at 1040 (citation omitted). "In determining whether a defendant's consent was voluntary, courts consider 'the characteristics of the person giving consent' and 'the encounter from which the consent arose.'" *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (quoting *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998)) "Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation." *Id.* (quotations omitted).

Myhre essentially argues that any statement during the execution of a search warrant is not voluntary, since he gives no reason why his circumstances were different than any other search. (*See* Dkt. No. 36 ("Under the coercive atmosphere of an interrogation occurring during the execution of a search warrant, the circumstances were overbearing.").) However, courts have rejected finding coercion or overbearing circumstances simply because a defendant was interrogated during execution of a search warrant. *Williams*, 760 F.3d at 816 ("Williams was not in custody, and a 'police-dominated' atmosphere arising from the execution of a search warrant by a group of armed agents likewise is not sufficient to establish an overborne will."); *see also United States v. Durand*, 11-cr-228 MJD/JJK, 2011 WL 5444112, at *8 (D. Minn. Oct. 24, 2011), *R&R adopted*, (D. Minn. Nov. 9, 2011).

The specific circumstances of Myhre's statement show that it was voluntary. First, there is no evidence of any coercive activity during the interview. Instead, SA Blackmore testified that the conversation was polite and cordial (Tr. 22), and the Court's review of the audio recording (Exs. 1A, 1B) substantiates that the tone was cordial and not coercive. Second, SA Blackmore did not make any promises to Myhre. (Tr. 19-20.) Third, the interview, which lasted for approximately an hour, was relatively short in duration. *See Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive."). Fourth, Myhre appeared to understand what he was being asked, did not seem confused during the interview, and showed no signs of intoxication or impairment. (Tr. 18.) Myhre is an employed adult (Ex. 1A) with previous experience with the criminal justice

system (Ex. 20 ¶¶ 25-26). The Eighth Circuit has generally concluded that "where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004). Based on the totality of the circumstances, the Court concludes that Myhre's statements were voluntary. Accordingly, the Court recommends that Myhre's motion to suppress his statement be denied.

### B.     Motion to Suppress Warrant

Myhre's Motion to Suppress Evidence initially sought to suppress evidence resulting from the search warrant. (Dkt. No. 22.) Myhre did not address the warrant in his post-hearing memorandum in support of his motion to suppress. (*See generally* Dkt. No. 36.) Federal Rules of Criminal Procedure 12(b)(3) and (c)(3) provides that motions to suppress evidence must be raised before trial or are waived, and the waiver provision 'applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion.'" *United States v. Reynolds*, 720 F.3d 665, 673 (8th Cir. 2013) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 656 (8th Cir. 2008)). "At minimum, it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed." *United States v. Rosetter*, No. 10-cr-83 (JNE/JSM), 2010 WL 5184991, at *23 (D. Minn. Oct. 1, 2010), *R.&R. adopted* 2010 WL 5173155, (D. Minn. Dec. 13, 2010) (citations omitted); *see also United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) (citations omitted) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to

12

support his position that evidence, statements or a witness identification should be suppressed."). "[E]ven in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality." *United States v. Starks*, 193 F.R.D. 624, 628 (D. Minn. 2000) (citation omitted). Myhre's failure to affirmatively provide the Court with support for the motion as it relates to the warrant is a sufficient basis for denial of the motion. *See Rosetter*, 2010 WL 5184991, at *23. Accordingly, the Court recommends that Myhre's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 22) be denied.

In any event, the Court has reviewed the warrant and finds that it is supported by probable cause. Courts review the affidavit for a search warrant for "facts sufficient to support a finding of probable cause." *United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Murphy*, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, *Gates*, 462 U.S. at 238)).

Here, SA Blackmore's affidavit states that his investigation used Undercover Investigative Software ("UIS") to track and download files that have been predetermined to be child pornography to determine the source of the file. (Ex. 4 at 18-19.) The

affidavit states that on September 5, 2016, officers used the UIS to download two child pornography files from a P2P file sharing from a specific IP address. (*Id.* at 19.) The affidavit states that local police downloaded the same or similar files from the same IP address on August 28, 2016. (*Id.* at 20.) Law enforcement subpoenaed the internet service provider for the IP address and resolved the account to Myhre's residence. (*Id.*) Law enforcement further determined that Myhre and the homeowner were both on the Minnesota Predatory Offender Registration based on prior sex offenses committed in Minnesota (*id.* at 20-21), and that the sex offenses involved minors (*id.* at 21). *See United States v. Brackett*, 846 F.3d 987, 993 (8th Cir. 2017) (holding that defendant's status as a registered sex offender for an offense involving a minor was a factor in finding probable cause that evidence of child pornography would be found). Based on this investigation, the Court concludes that there was a "fair probability that contraband or evidence" of child pornography would be found at Myhre's residence. For this reason too, the Court recommends that the motion to suppress evidence be denied.

### III.   RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1. Defendant's Motion to Suppress Statements, Admissions and Answers (Dkt. No. 20) be **DENIED**.

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 22) be **DENIED**.

DATED: April 29, 2019                             *s/Elizabeth Cowan Wright*
                                                  ELIZABETH COWAN WRIGHT
                                                  United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).